IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Criminal No. 2:23-cr-129 - 22 |
| v. | Hon. William S. Stickman IV |
| MAURICE SMITH, | |
| *Defendant.* | |

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

On October 17, 2023, Maurice Smith ("Smith ") was charged by superseding indictment at Count Five with Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 538). It is alleged that on or about August 31, 2022, knowing that he had previously been convicted of crimes punishable by a term of imprisonment exceeding one year, Smith possessed a Glock 43x, 9mm pistol, bearing serial number BPGL565, and Aguila and W.I.N. ammunition. (*Id.* at p. 9). The qualifying prior convictions were identified as follows: (1) March 19, 2015, Firearms Not to Be Carried Without a License in the Allegheny County Court of Common Pleas, Pennsylvania at Docket Number CP-02-CR-700-2014; (2) September 7, 2016, Burglary in the Allegheny County Court of Common Pleas, Pennsylvania at Docket Number CP-02-CR-15164-2015; and, (3) September 7, 2016, Robbery and Firearms Not to Be Carried Without a License in the Allegheny County Court of Common Pleas, Pennsylvania at Docket Number CP-02-CR-15168-2015. (*Id.*). The Government has provided the following summary of Smith's prior felonious conduct:

1

In March of 2015, Smith was convicted of Firearms No[t] To Be Carried Without a License, a felony of the third degree. He was sentenced to nine to eighteen months incarceration, followed by two years' probation. Approximately three months later, he was convicted for Retail Theft and Possession of a Controlled Substance, for which he was sentenced to probation.

While serving these sentences, the defendant was arrested for Burglary, Robbery, and Conspiracy to Commit Robbery, all first-degree felony offenses, on November 3, 2015. In that instance, the defendant pointed a firearm at his victim and stole his phone, which also contained money and cards within the phone case. The defendant fled from the scene into an abandoned building. The defendant surrendered to police, who later found the stolen items and firearm hidden inside of the building. On September 7, 2016, the defendant was convicted and sentenced to four to eight years' incarceration, followed by 3 years' probation.

On the same day that the defendant pleaded guilty to the Burglary and Robbery case, he pleaded guilty to two additional felony cases. On October 11, 2015, the defendant and his coconspirator, Kendre Cain, took $150.00 and an Apple iPhone from their victim at gun point. [A]n additional felony. The defendant was charged with felony Robbery and Conspiracy. On September 7, 2016, he was sentenced to four to eight years incarceration. The defendant was convicted of Escape, a felony of the third degree, and sentenced to three years' probation. Importantly, the defendant was still on supervision for these charges at the time of the instant offense.

(ECF No. 873, pp. 2-3).

Smith filed a motion to dismiss the indictment against him arguing that § 922(g)(1) is unconstitutional under the Second Amendment as applied to him.  (ECF Nos. 849, 850 and 890). For the following reasons, the Court will deny Smith's motion (ECF No. 849).

## I.   STANDARD OF REVIEW

The Federal Rules of Criminal Procedure require that an indictment be a plain, concise and definite written statement of the essential facts constituting the offense charged.  Fed. R. Crim. P. 7(c)(1).  An indictment is sufficient if it includes the elements of the offense intended to be charged, apprises the defendant of what he must be prepared to defend against at trial, and enables him to plead a former acquittal or conviction in the event of a subsequent prosecution. *United States v. Rawlins*, 606 F.3d 73, 78-79 (3d Cir. 2010); *United States v. Vitillo*, 490 F.3d

314, 321 (3d Cir. 2007). An indictment that fails to charge all elements of a crime must be dismissed. *United States v. Cochran*, 17 F.3d 56, 57 (3d Cir. 1994).

A motion to dismiss an indictment is governed by Rule 12 of the Federal Rules of Criminal Procedure ("Rule 12"), which states: "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1).

> [T]he scope of a district court's review at the Rule 12 stage is limited. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted). "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 661. There is no criminal corollary to the civil summary judgment mechanism. *Id.* In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal marks and citation omitted). Thus, a district court's review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012), *abrogated on other grounds*. Under Rule 12, the Court can dismiss criminal charges in an indictment where there is an infirmity of law in the prosecution, such as an unconstitutional statute.

## II.   ANALYSIS

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the Supreme Court held that, "on the basis of both text and history," the Second Amendment protects *an individual's* right to keep and bear arms. *District of*

*Columbia v. Heller*, 554 U.S. 570, 595 (2008).  The Supreme Court made clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Id.* at 626. Relevant to the instant motion, the Supreme Court stated:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 625-27.  It further noted that "these presumptively lawful regulatory measures" were only examples and not an exhaustive list.  *Id.* at 627 n.26.  "[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."  *Id.* at 635.

In June 2010, the Supreme Court held that the Second Amendment right, elucidated in *Heller*, is incorporated against the states.  *See McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).  More specifically, it held that the "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states."  *Id.*  The Supreme Court reiterated its observations in *Heller*, 554 U.S. at 626, that the right protected by the Second Amendment (like the rights protected elsewhere in the Constitution) is not unlimited and stated plainly: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here."  *McDonald*, 561 U.S. at 786 (quoting *Heller*, 544 U.S. at 626-27).  "[I]ncorporation does not imperil every law regulating firearms."  *Id.*

4

In 2022, the Supreme Court articulated an approach to addressing challenges invoking the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). It rejected the kinds of tests developed by the courts of appeal which employed a "means-end" scrutiny. *Bruen*, 142 S. Ct. at 17-20. In their place, the Supreme Court articulated a new test:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). *Bruen* does not explicitly address the propriety of firearm possession bans for persons previously convicted of a felony crime; however, it refers to those falling under the protection of the Second Amendment as "law-abiding" people. Thus, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament. The Supreme Court explicitly stated that it is "[i]n keeping with *Heller*." *Id.*

Since then, the United States Court of Appeals for the Third Circuit directly applied *Bruen* in *Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023) (*en banc*). The Third Circuit evaluated an as-applied challenge under *Bruen* to the prohibition on felons possessing guns in § 922(g)(1). Range pleaded guilty in 1995 to making a false statement to obtain food stamps. *Id.* at 98. At the time he pleaded guilty, his conviction was considered a misdemeanor punishable by up to five years' imprisonment. *Id.* But his conviction precluded him from possessing a firearm under § 922(g)(1). *Id.* To reemphasize – Range was not a felon; he committed a nonviolent misdemeanor offense relating to false statements on paperwork for public benefits. Range wanted to possess a hunting rifle and a shotgun for home defense, so he

sought a declaration that § 922(g)(1) violates the Second Amendment as applied to him.  *Id.* at 99.

The Third Circuit applied the *Bruen* analysis and ruled in Range's favor.  After determining that Range was one of "the people" to whom the Second Amendment applies, and his proposed conduct (owning a hunting rifle) was protected by the Second Amendment, the Third Circuit then asked whether the government carried its burden to justify stripping Range of that right.  In order to justify § 922(g)(1), as it applied to Range, the government needed to show that the statute was "consistent with the Nation's historical tradition of firearm regulation."  *Id.* (quoting *Bruen*, 142 S. Ct. at 2130).  Ultimately, the Third Circuit determined that the government had not met its burden because a review of sources from the founding era and early Republic do not reveal that the disarmament of people like Range was practiced or contemplated. Rather, a review of those sources demonstrated that at the time of the ratification of the Second Amendment, disarmament was limited to individuals who were viewed as dangerous to the community.  *Id.* at 103–04.  In other words, the Third Circuit held that the government failed to show that the historical tradition of firearms regulation would have deprived Range of his Second Amendment right to possess a firearm in light of his conviction for making false statements on an application for public benefits.  *Id.* at 106.

Notably, the Third Circuit emphasized that its decision in *Range* "is a narrow one."  *Id.* at 106.  It did not invalidate § 922(g)(1).  As Judge Ambro stated in a concurrence joined by two other judges, § 922(g)(1) "remains. . . because it fits within our Nation's history and tradition of disarming those persons who legislature believe would, if armed, pose a threat to the orderly functioning of society."  *Id.* at 110 (citations omitted).  Furthermore, the majority opinion

6

recognized that the statute is constitutional when applied to violent felons. *Range*, 69 F.4th at 104.

Smith's "as applied" challenge fails. Applying the *Bruen* framework to this case, the threshold question is whether Smith is one of "the people" protected by the Second Amendment despite having prior felony convictions. *Range*, 69 F.4th at 101. In *Range*, the Third Circuit majority held that "the people" in the constitutional text refers to all Americans and not only law-abiding persons. *Id.* The Third Circuit agreed with a statement of then-Judge Amy Coney Barrett that "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). Accordingly, as the Government concedes (ECF No. 873, p. 13), Smith is one of "the people" protected by the Second Amendment.

Having determined that Smith is one of "the people," the next question is whether "'the Second Amendment's plain text covers [Smith's] conduct,' and 'the Constitution presumptively protects that conduct.'" *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2126). The Third Circuit in *Range* considered the defendant's underlying offense of conviction. Consequently, the Court, contrary to Smith's argument otherwise, must consider Smith's alleged criminal conduct and his criminal history.

Smith was located in a house that was the subject of a search warrant. The Government has represented that five firearms, extended magazines, and ammunition were recovered. (ECF No. 873, p. 2). While being present in a house with firearms is not necessarily disruptive to the orderly functioning of society, it is alleged by the Government that only one firearm was licensed and registered. Two others had obliterated serial numbers. The Government has alleged that the gun which is the subject of the charge pending against Smith had his DNA present on textured

areas.   Smith has advanced no argument that he possessed the gun in the residence for self-defense.   It is hard for him to make such an argument as he is classified as a person prohibited from possessing a firearm by virtue of his criminal history.

Smith, unlike Range, is a violent felon.   The Government has outlined some of Smith's criminal history in its response.   (ECF No. 873).   As noted in the superseding indictment, Smith has been convicted of carrying a firearm without a license on two separate occasions.   He has also been convicted of burglary and robbery.   Of note, Smith used a firearm to commit these offenses.   In other words, he has robbed innocent people at gunpoint.   Smith's criminal history demonstrates that he has engaged in conduct reasonably likely to cause danger to life and limb and general mayhem.   Added to this, Smith has a propensity to do so while under court supervision.   He was on state probation at the time he engaged in the charged criminal conduct.

Section 922(g)(1)'s ban on firearm possession by persons, like Smith, is consistent with our country's historic tradition of regulating firearms.   While, as *Range* observed, there is no historical tradition from the colonial era or early Republic categorically disarming those merely convicted of crimes (particularly, crimes relating to the sort of conduct that Range committed), there is a long history of disarming people who pose a danger to society.   As early as the seventh century, English law permitted the disarmament of violent and dangerous people.   Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 258 (2020) (citing Ancient Laws and Institutes of England 3 (Benjamin Thorpe ed., 1840) (describing the Laws of King Aethelbirht as banning the provision of arms to another "where there is strife").   A millennium later, in the seventeenth century, King Charles II ordered the Lord Mayor of London to disarm "dangerous and disaffected persons."   *Id.* at 259 (citing 10 Calendar of State Papers, Domestic Series, Domestic Series of the Reign of Charles II,

<u>1660-1670</u> 237 (1895)).  This included Catholics who, following the failed gunpowder plot, were viewed as disloyal and potentially dangerous.  *Id.* at 258 (citing 1 <u>Stuart Royal Proclamations: Royal Proclamations of King James I 1603-1625</u>, 247-48 (June 2, 1610) (James F. Larkin & Paul I. Hughes eds., 1973)).

Colonial laws mirrored English models and similarly disarmed those persons viewed as a danger to public order, including American Indians, Catholics, Quakers, slaves, and freed Black people.  There is no question that such laws imposing discriminatory class-wide disarmament would, thankfully, fail constitutional scrutiny under modern standards.  Nevertheless, they demonstrate that at the time of the founding, the American colonists were accustomed to laws depriving people posing a threat to society (as they viewed it) from possessing arms.  Colonial laws also disarmed those whose actions made them a danger to the community.  Laws passed in Massachusetts Bay and New Hampshire forbade the carrying of arms "in an aggressive and terrifying manner."  *Id.* at 262.  Likewise, Virginia allowed the disarmament of those "who ride, or go, offensively armed, in Terror of the People."  *Id.* at 262 (citing George Webb, <u>The Office of Authority of a Justice of the Peace</u> 92-93 (1736)).

At the time of the ratification of the Second Amendment, alongside the several states' declarations of rights, the framers and the people understood that the right to keep and bear arms extended to all "peaceable" citizens.  Wyoming LR at 266 (citing 2 Bernard Schwartz, The Bill of Rights: A Documentary History 675 (1971)); *see also* Stephen Halbrook, That Every Man Be Armed 86 (revised ed. 2013) ("[T]he Second Amendment…originated in part from Samuel Adams's proposal…that Congress could not disarm any peaceable citizens.").  Samuel Johnson's dictionary from the time of ratification defined "peaceable" as "1.  Free from war; free from tumult; 2. Quiet; undisturbed; 3. Not violent; not bloody; 4. Not quarrelsome; not

turbulent." 2 Samuel Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773).[1]  The prevailing view that "peaceable" citizens were secure in their right to keep and bear arms excluded those who did not fall within that definition—those who were, conversely, dangerous. As Third Circuit Judge Thomas M. Hardiman's concurring opinion in *Binderup v. Att'y Gen. United States of America*, 836 F.3d 336, 368 (3d Cir. 2016) observed:

> [T]he debates from the Pennsylvania, Massachusetts and New Hampshire ratifying conventions, which were considered "highly influential" by the Supreme Court in *Heller*...confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses.  Hence the best evidence we have indicates that the right to keep and bear arms was understood to exclude those who presented a danger to the public.

(internal citations omitted).

The disarming of people who pose a danger to society is deeply rooted in our country's legal traditions.  "The right to keep and bear arms always has been subject to careful limitations," which "are at their zenith when applied to people who are the antithesis of the law-abiding citizen who wants to exercise his or her right to self-defense, whether at home or in public, and who may also enjoy the various sports and other activities that involve guns."  *Atkinson v. Garland*, 70 F.4th 1018, 1037 (7th Cir. 2023) (Wood, J., dissenting).  Holding § 922(g)(1) unconstitutional as applied to a defendant like Smith would strip Congress of its ability to protect the public from a clear and present danger.  This is not something that the Court is willing to condone.  Smith's background shows that he poses a danger to society.  It is consistent with the Supreme Court's observation in *Heller* and its progeny, as well as historical tradition, to deprive him of his right to possess a firearm.  The prohibition on firearm possession by felons under § 922(g)(1) does not violate the Second Amendment, particularly as applied to Smith.

---

[1]  Johnson's dictionary is an authoritative resource for the meaning of words as understood by the founding generation.  The Supreme Court cited to it in *Heller* to interpret the language of the Second Amendment.  *See Heller*, 554 U.S. at 582-84.

In sum, § 922(g)(1) is constitutional as applied to Smith.

### III.   CONCLUSION

For the foregoing reasons, Smith's motion will be denied.  An Order of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

3-1-2024
_____
Date